## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| _____ | : | |
| GOEATED LTD. | : | |
| | : | |
| v. | : | NO. 22-CV-4903 SWR |
| | : | |
| CURTIS EDWARD BARLOW, JR. and | : | |
| 484 ENTERTAINMENT LLC. | : | |
| _____ | : | |

## O P I N I O N

SCOTT W. REID                                         DATE:  June 27, 2025
UNITED STATES MAGISTRATE JUDGE

In this action, Plaintiff Goeated Ltd. ("Goeated") has alleged counts for breach of contract, anticipatory breach, and fraud against Curtis Edward Barlow, Jr., ("Barlow") and 484 Entertainment LLC ("484 Entertainment"), and vicarious liability against 484 Entertainment.  In short, Goeated and Barlow entered three agreements whereby Goeated paid Barlow a total of $1,300,000 to list its Volt Inu digital token on a number of cryptocurrency exchanges.  Barlow only achieved the listing of the token on one exchange.  He did not return any of Goeated's payments.  Goeated now seeks the entry of partial summary judgment against Barlow only, for breach of contract.  As explained below, its motion will be granted.

I.     *Cryptocurrency, Tokens, and Exchanges*

As discussed below, the resolution of Goeated's Motion for Summary Judgment requires only reference to the basic principles of contract law.  Nevertheless, cryptocurrency is central to this case, and although it is increasingly part of the general societal discourse, it is still a relatively new phenomenon.  Accordingly, I will briefly review and identify cryptocurrency-related concepts.

As the Delaware Superior Court has explained:

> Cryptocurrency is a type of digital or virtual currency "maintained by a decentralized network of participants' computers. *Archer v. Coinbase*, 267 Cal. Rptr. 3d 510, 513 (2020). Cryptocurrencies are unique in that they "exist solely on the internet and are unregulated and unmanaged by third parties, such as banks or governments." *Blocktree Props., LLC v. Pub. Util. Dist. No. 2 of Grant Cnty. Washington*, 380 F. Supp. 3d 1102, 1110 (E.D. Wash. 2019). It uses cryptography for security, and "[l]ike traditional forms of currency, cryptocurrency can be bought and sold on digital exchanges." *Balestra v. Giga Watt, Inc.*, 2018 WL 8244006 at *1 (E.D. Wash. June 18, 2018).

*Diamond Fortress Technologies, Inc. v. EverID, Inc.*, 274 A.3d 287, 296-7 (Del. Super. Apr. 14, 2022). Thus, cryptocurrency is used very much like a conventional (or, "fiat") currency.

The term "digital token" or "crypto token" is often used interchangeably with "cryptocurrency," but in fact, a token is a representation of an asset or interest that has been tokenized on an existing cryptocurrency's blockchain. Https://investopedia.com/terms/c/crypto-token.asp. Digital tokens, like cryptocurrency, can be bought or sold on digital exchanges, which work like stock exchanges to help an investor buy or sell in digital currencies. Forbes.com/advisor/in/investing/cryptocurrency/what-is-a-crypto-exhange/#meaning_of_a_crytocurrency exchange.

Thus, digital tokens are in many ways analogous to stocks or commodities. However, "unlike corporate stock, which is backed by hard assets held by the company, or fiat currency that is backed by the issuing government entity, cryptocurrencies are only worth what someone is willing to pay for them on any given day … That is, someone purchases a coin or token because the buyer believes it will increase in value over time. When the buyer believes the coin or token will decrease in value, it is sold." *In e FTX Trading Ltd.*, No. 22-11068, 2024 WL 3191668 at *1 (Bankr. D. Del. June 26, 2024).

The fact that a token is "digital" means that there is no physical "coin" or "token"; a crypto token exists only as a section of blockchain computer code.  Possession of cryptocurrency is demonstrated by its location in its owner's "wallet," but – again – there is no physical wallet involved.  A "wallet" is also computer code which "contains information used to move units of a cryptocurrency on a blockchain."  *Diamond Fortress Technology, Inc.*, *supra*, at 274 A.3d 297, *quoting Zietzke v. United States*, 2020 WL 264394 at *1 (N.D. Cal. Jan. 17, 2020).

II.    *Factual and Procedural Background*

Goeated describes itself as a cryptocurrency company organized under the laws of the Republic of Seychelles, which has been "developing and enhancing" a digital token called Volt Inu ("the token") since March, 2022.  *Amended Complaint* at ¶¶ 2 and 9.  It operates through its director, Joelson Mercedo Mahinay.  *Id*. at ¶ 10.  In order to promote the token, Goeated/Mahinay communicated about it on the messenger app Telegram, using the name Ape_Kong at the address @ape_kong.

On January 1, 2022, the Ape_Kong account received a message on Telegram from Curtis Barlow, identified as CJ with the address @cjcelebmarketing.  Messages between Goeated[1] and Curtis Barlow, attached to *Motion for Summary Judgment* as Exhibit B, at ECF page 2 at 21:53.  In the message, CJ (i.e. Barlow) offered to assist Goeated in promoting the Volt Inu token by obtaining a promotional tweet for the token from performer Soulja Boy, and obtaining a billboard in Times Square.  *Id*.

Barlow admitted at his December 23, 2024, deposition that the @cjcelebmarketing account was his, and that the messages in the chat were between him and Goeated.  *Deposition of Curtis Edward Barlow, Jr.*, attached to *Motion for Summary Judgment* as Exhibit C at 26:11-16.

---

[1] In the messages, Mahinay's nickname Ape Kong is used.  However, in referring to the messages, I have replaced the "Ape Kong" name with "Goeated" for clarity.

All business transactions between Goeated and Barlow were made via Telegram messages. At his deposition, Barlow testified – referring to transactions he entered with a third party named Jonathan Poyser – that agreeing on terms via text messages was common in this context:

> Q: Were you – did you always agree on the terms of how you dealt with him through text messages?
>
> A: Yes. I would say that's how most of the crypto industry operates.

Plaintiff's Exhibit C at 51:10-13.

On April 25, 2022, Barlow messaged Goeated: "I can help with exchange listings by the way." Plaintiff's Exhibit B at ECF page 77 at 22:09. Barlow does not dispute that he offered his services to get the Volt Inu token listed. *Responses to Requests for Admission*, attached to *Motion for Summary Judgment* as Exhibit D, at Response to Request for Admission No. 5. Goeated responded: "Sounds awesome which ones are you in contact with?" and Barlow forwarded a list of 28 exchanges. Plaintiff's Exhibit B at 77-78.

Goeated indicated that he was interested in six of the exchanges, and asked: "Are you sure you can get us listed on these exchanges or is it subject to approval?" *Id*. at 78 at 23:59. Barlow responded: "Can 100% get tokens listed." *Id*. at 1:29. Goeated asked: "Does it go the official way? Or how do you usually proceed?" *Id*. at 79 at 1:38. Barlow responded: "Yes it goes the official way but is basically expedited through my contacts and guaranteed." *Id*. at 2:26. Goeated wrote: "Absolutely awesome. Lmk how you'd like to get started." *Id*. at 79.

Barlow then sent Goeated a price list for each exchange:

KuCoin – 200k
VinDax – 25k
Bithumb – 75k
Poloniex – 165k
FTX – 185k
Liquid – Exchange needs to review the project and then submit.

*Id*. at 79 at 7:02.

Goeated next wrote:

sounds great

kinda what I had in mind

payment is done only once we're approved, right? or are we automatically approved? Lol

can we start with these 4 asap

VinDax – 25k
Bithumb – 75k
Poloniex – 165k
FTX – 185k

*Id*. at 79-80 at 7:40 -7:41.

Barlow responded: "Automatically approved unless stated otherwise such as select exchanges like liquid that need to review the project first. The others are a pay and go for the listing." *Id*. at 80 at 8:37. Goeated wrote back: "Freaking awesome lol So lmk how we should go ahead with the 4 mentioned above already?" *Id*. at 12:44. Barlow sent him the address for payment, which, as Barlow testified at his deposition, was the Ethereum wallet he used to conduct business. Plaintiff's Exhibit C at 33:6-16 ("For this specific deal with VOLT, that is the wallet that was used)."

5

Goeated had a few "quick questions."  Among them were "shall I pay all at once?" and "Do we get a refund if the listing doesn't happen?"  Plaintiff's Exhibit B at 80 at 16:51-16:52.  To the former, Barlow responded:  "Yes so we can tackle the four exchanges you're interested in.  Like I mentioned it is a pay and go situation like a celebrity endorsement." *Id*. at 81 at 18:33.  To the latter, he simply responded:  "Yes." *Id*. at 80 at 18:26.

The next afternoon, on April 27, 2022, Barlow reached out to Goeated:  "Do you have a day in mind for when you'd like to get started with these four?" *Id*. at 81 at 1622.  Goeated replied:  "Absolutely : ) gonna send payment today." *Id*. at 16:56.  He then sent Barlow the Ether equivalent of $457,319.40, in accordance with the prices Barlow had specified. *Ether Transaction to Barlow's Wallet*, attached to *Motion for Summary Judgment* as Exhibit E.   At his deposition, Barlow confirmed that he received payment in his Ether wallet for listing on four exchanges.  Plaintiff's Exhibit C at 33:17-19.

On April 29, 2022, Barlow offered to procure listings on exchanges other than those already agreed upon in a "package deal" for either $7 million, if Binance was included, or $3 million, without Binance.  Exhibit B at ECF page 83-84 at 1:44.  Goeated declined, saying it was "a bit out of the budget at the moment." *Id*. at ECF page 84 at 4:32.  Nevertheless, the two continued to discuss other possible package deals which might fit within the Volt Inu budget. *Id*. at ECF pages 84-94.

On May 3, 2022, Barlow offered Goeated a deal for $1 million to list on the previously agreed-upon exchanges, plus Crypto.com and KuCoin. *Id*. at ECF page 93-4 at 00:45  He specified:  "This would be the bank route which is why it's cheaper than listing individually." *Id*.  Goeated inquired about the "timeframe," and Barlow responded:

> Since it's a bank introduction we have an onboarding process which is about 4 weeks which is then followed up by a 4-6 week listing process and it is guaranteed in terms of

the deal  Once we dove a bit deeper with everything we were able to discuss current pricing, timeframes, etc.  To go live it's relatively the same timeframe for both.

*Id.*. at 1:26.

Eventually, Goeated agreed to the $1,000,000 package deal proposed by Barlow,

confirming the following terms:

So, $1 M covers the introduction fee, listing fee and any other costs (excluding the liquidity/funds we have to deposit for the market maker) for all the below exchanges.

FTX, Poloniex, Bithumb, Crypto.com and Kucoin

Can you confirm?

If so, then let's go ahead and tryna speed up the onboarding process.

*Id.* at ECF page 94 at 18:24.  Barlow responded "Yes."  *Id.* at ECF pages 94-95 at 21:34.

Goeated wrote back:  "Alright!  Let me know how you wanna go ahead."  *Id.* at ECF page 95 at

2:46.

Again, Barlow forwarded to Goeated the address for his wallet.  *Id.* at 95 at 15:08.  On

May 6, 2022, Goeated wrote:  "sending within 2-3 hours.  $575 k needs to be sent, can you

confirm?"  *Id.* at ECF page 96 at 18:12.  After some intervening discussion of other promotion

possibilities, Barlow responded:  "its 550k not 575k."  *Id.* at ECF page 102 at 21:17.  Later that

day, Goeated transferred 204.400 in Ether to Barlow's wallet, with a value of $538,633.31.

*Transaction Receipt*, attached to *Motion for Summary Judgment* as Exhibit G.  Goeated sent

Barlow a confirmation link, and Barlow responded:  "Received."  Plaintiff's Exhibit B at 103 at

3:00 and 3:12.

On May 13, 2022, the Volt Inu token was listed on VinDax.  *Id.* at ECF pages 119-20 at

3:43-3:46.  Barlow and Goeated continued to communicate about listing the token on other

exchanges.  On May 14, 2022, Barlow had offered to have the token listed on Binance for

$450,000, rather than the $4 million he had quoted on April 29, 2022.  *Id*. at ECF pages 83-84 at 1:44; 121 at 3:49.  On May 27, 2022, Barlow told Goeated he could have it listed for "300-350k … (I'll see if we can get it done for 300)."  *Id*. at ECF page 153 at 18:50.  Goeated responded: "If 300k is feasible it would eventually be an option to consider!"  *Id*. at 14:40.

On June 2, 2022, Goeated asked Barlow if he had been able to confirm that the token could be listed on Binance for "300k."  *Id*. at ECF page 158 at 9:11.  Barlow wrote:  "sorry I thought I mentioned it was confirmed."  *Id*. at 9:28.  Goeated wrote back:  "awesome wasn't sure if it was confirmed or not. what's the deadline for payment?"  *Id*. at 20:10.  Barlow responded: "as soon as possible for payment."  *Id*. at 20:12.  He requested that Goeated pay him in USDT cryptocurrency.  *Id*. at ECF page 59 at 23:41.  He then sent Barlow his wallet address.  *Id*. at ECF page 159 at 4:08.

In the next few days, the parties discussed further details of the agreement to list on Binance.  On June 4, 2022, Goeated asked Barlow for a timeframe, and Barlow explained:

> So after onboarding is complete that's when I'll get an estimated listing date but just so you have a timeframe a couple weeks (2-3 max).  Then we space everything out by 3 weeks from the FTX listing.  Onboarding is the most cumbersome process.  Once its done its done and we can tackle additional listings in the future without the hassle of this : )

*Id*. at ECF page 162 at 21:32.

On June 6, 2022, Goeated transferred USDT cryptocurrency equivalent to $300,096.54 to Barlow's wallet.  *Transfer Confirmation* attached to *Motion for Summary Judgment* as Exhibit H. He sent Barlow a link confirming the payment.  Plaintiff's Exhibit B at ECF page 164 at 4:37. Barlow responded:  "Received."  *Id*. at 17:25.

Over the next month, Goeated repeatedly messaged Barlow for updates on the expected exchange listings.  Barlow replied with vague reassurances, but no definite news of a listing, and the rate at which he responded to Ape Kong slowed down over time.  On June 15, 2022, Goeated wrote:  "Hey hope all OK?  Just circling back to see if all goes well with the listings?  We should be done with the onboarding process now right?"  *Id*. at ECF page 165-6 at 10:17.  Barlow answered:  "Yes we're wrapping up ( : I'll keep you in the loop with dates.  Just waiting right now."  *Id*. at ECF page 166 at 13:28.

Over the next few days the parties communicated about liquidity deposits, and on June 20, Goeated wrote:  "Hey hope all OK?  Did you get any news on the above?  As well as the ftx listing date?"  *Id*. at ECF page 168 at 18:55.  Goeated replied the next day:  "We're waiting for some paper work to go through then we'll get the dates.  Only thing we are waiting for at the moment."  *Id*. at 1:20.  Goeated wrote back:  "Sounds great!!  Are we still on track to get it live in 2-3 weeks?"  *Id*. at 1:58.  Barlow did not respond.  The next day, Ape Kong wrote:  "Gm just following up on the above."  *Id*. at ECF page 169 at 16:41.  Barlow then assured Ape Kong:  "We should still be on track yes.  I'm just waiting on them still."  *Id*. at 1:52.

On June 26, 27, and 28, 2022, Goeated messaged Barlow several times with questions, and Barlow answered on the 28th, adding:  "sorry for not responding I'm in the middle of moving so I'm just a bit busy this week."  *Id*. at ECF pages 169-170.

Goeated wrote to Barlow again on June 30, 2022:  "Hey hope all ok?  Did you get any news?"  *Id*. at ECF page 170 at 20:46.  Several hours later, on July 1, 2022, he wrote:  "ftx is supposed to happen this week, would be good if we can organize everything more than 24 hours ahead.  *Id*. at 3:13.  Barlow replied:  "Hey I'm still waiting for a date."  *Id*. at ECF page 171 at 16:58.  Goeated wrote:  "You think the listing is still good to go next week or do we have any

delay?"  *Id*. at 17:05.  Barlow replied by asking Goeated if he would give him power of attorney to sign documents, but did not answer the timing question.  *Id*. at 19:14.

On July 4, 2022, Goeated wrote to Barlow:  "Do you know if the FTX listing is still expected this week?"  *Id*. at ECF page 172 at 16:13.  Barlow did not answer.  Goeated messaged him twice on July 5, 2022.  *Id*. at 1:57 and 16:50.  On July 6, 2022, he wrote three separate messages:  "Hey what's up?" "?" and "hey man what's going on?"  *Id*. at 1:04, 9:09, and 21:49. Barlow wrote back later that day, telling Goeated that he was sick with COVID, but that he "just followed up" and would "keep you updated as soon as I hear back."  *Id*. at 23:51.

The next day, July 7, 2022, Goeated wrote:  "Can you make sure they get back to us today with a date and/or an agreement?"  *Id*. at ECF page 173 at 12:40.  Barlow answered: "Yessir trying to get a date asap.  I'm sorry about not being as active.  I'm so sick rn.  Trying to recover a bit."  *Id*. at 16:46.  This was the last message Barlow sent Goeated.

On July 8, 2022, Goeated messaged Barlow twice.  *Id*. at ECF page 173 at 8:28 ("lmk today since it's a kinda mess with still no news in the week we were supposed to get listed … "). On July 9, 2022, he messaged Barlow twice.  *Id*. at ECF page 174 at 2:01 and 17:08 ("Hey, COVID or not it would be kinda the least to get some more regular updates considering we already paid the $1.3M and considering the delay we already have."  On July 11, 2022, he reached out to Barlow again.  *Id*. at 15:28 ("Possible to get any news today?").  And, on July 12, 2022, he messaged Barlow once more.  *Id*. at 15:33 ("is it possible to finally get an answer …?").

Goeated called Barlow five times on July 13, 2022, but Barlow did not answer.  *Id*. at ECF pages 174-5.  He then wrote:  "Let me know what the status is by Friday at the latest."  *Id*. at 175 at 23:25.

At this point, Goeated appears to have realized that something bad had happened.  Its next message, sent July 14, 2022, was:  "Cause tbh ["to be honest"] it kinda starts to look like really weird without any answer in more than a week."  *Id*. at 3:42.  On July 15, 2022, he wrote:  "In case you plan not to respond anymore, just wanted to remind you that we have pics of yourself and your Coinbase wallet."  *Id*. at 0:16.  He also tried to call Barlow twice on July 15, 2022.  *Id*. at 9:40 and 9:41.  Later that day, he wrote:  "FYI, if we still don't get any news from you within the next 24 hours from now, we'll go ahead with the required legal proceedings."  *Id*. at ECF page 175-6 at 13:06.

On July 19, 2022, Goeated wrote to Barlow again:  "Still no news??? would of thought you'd at least be man enough to answer."  *Id*. at ECF page 176 at 16:50, 16:53.  He placed two more calls to Barlow on July 28, 2022.  *Id*. at 12:12, 12:13.

This case was filed on December 9, 2022.  Barlow was deposed on December 23, 2024.  At his deposition, Barlow admitted that he did not respond to Goeated's attempts to communicate with him from July 8, 2022, forward.  Plaintiff's Exhibit C at 48:2-11.  He acknowledged that he did not have the Volt Inu token listed on any exchange other than VinDax.  *Id*. at 34:20-22.  Barlow also admitted that he had never provided a refund to Goeated.  *Id*. at 35:18-19.

Barlow testified at his deposition that he had no experience with listing tokens on cybercurrency exchanges at the time he agreed to do so for Goeated.  *Id*. at 20:8-13.  According to him, "a trusted third party" – i.e., Jonathan Poyser – "offered the services" to him, and so he "presented the service to Ape Kong."  *Id*. at 20:14-18.  He testified that the prices he charged Goeated were those offered to him by Poyser, but with an added 10% commission for himself.  *Id*. at 24:5-8.

Barlow testified that, after he sent payment to Poyser, Poyser and the company with which he was working, AIC, gave him "the run around," meaning that "they did not follow up on their word." *Id*. at 24:15-22. He testified: "They had the intention to scam me from the beginning is my assumption." *Id*. at 24:18-19. Barlow has not, however, attempted to join Poyser or AIC as third-party defendants in this action.

In Barlow's response to Goeated's motion for summary judgment, he asserts that he paid Jonathan Poyser $325,000 of Goeated's money for his assistance in getting the Volt Inu token listed, but he does not claim that Poyser "scammed" him. *Defendant's Proposed Statement of Undisputed Facts*, attached to *Response* as Exhibit 1 at ¶¶ 15-16. Instead, Barlow argues that (1) there were no contracts because significant terms were omitted from their agreements; (2) alternatively, performance was rendered impossible because Goeated retained other individuals to list its token; and (3) performance was rendered impossible due to *force majeure* in that the November 11, 2022, FTX bankruptcy led to a collapse in the cryptocurrency market. He maintains that he never repudiated his "promise" to list the Volt Inu token, but that he did not promise to have the tokens listed immediately. He also argues that issues of fact remain for a jury to decide regarding the amount of any damages sustained by Goeated.

III.    *Relevant Legal Principles*

A.    *Standard for Summary Judgment*

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must present more than mere bare

assertions, conclusory allegations, or suspicions to show the existence of a genuine issue.

*Jutrowski Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). It is not sufficient to reassert

factually unsupported allegations contained in the pleadings. *Anderson v. Liberty Lobby*, 466

U.S. 242, 249 (1986*); Celotex*, *supra*, at 325.

When ruling on a summary judgment motion, the court must construe the evidence and

any reasonable inferences drawn from it in favor of the non-moving party. *Anderson v. Liberty*

*Lobby*, *supra* at 255; *Tiggs Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). The

court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the

evidence presented." *Anderson*, *supra*, at 466 U.S. at 252. Where the record, taken as a whole,

could not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue

for trial" and the court should grant summary judgment in favor of the moving party. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B.     *Breach of Contract*

As then-District Court Judge Felipe L. Restrepo explained:

"Under Pennsylvania law, '[a] breach of contract action involves (1) the existence of a
contract; (2) a breach of a duty imposed by the contract; and (3) damages." *Burton v.
Teleflex Inc.*, 707 F.3d 417, 431 (3d Cir 213) (quoting *Braun v. Wal-Mart Stores, Inc.*, 24
A.3d 875, 896 (Pa. Super. Ct. 2011). To satisfy the first element – the existence of a
contract itself – a party must plead enough facts to demonstrate "(1) [that] both parties
manifested an intention to be bound by the agreement; (2) [that] the terms of the agreement
are sufficiently definite to be enforced; and (3) [that] there was consideration." *ATACS
Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998).

*Abdul-Rahman v. Chase Home Fin. Co., LLC*, Civ. A. No. 13-5320, 2014 WL 3408564 at *2

(E.D. Pa. July 11, 2014). (Brackets supplied). Although Judge Restrepo was setting forth the

elements a plaintiff needed to plead, these are the same elements a plaintiff ultimately needs to

prove to show the existence of a contract.  *See Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298-9 (3d Cir. 1986).[2]

1.    *The Existence of a Contract*

In determining whether both parties manifested an intention to be bound by an agreement, the object of inquiry is not the inner, subjective, intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.  *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009).

As to definiteness of the terms, the Court of Appeals for the Third Circuit in *American Eagle* quoted the Pennsylvania Supreme Court:  "In order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain."  584 F.3d at 585, *quoting Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663, 666 (1956).  These material and necessary details include the time and manner of performance, and price or other consideration.  *Ecore International, Inc. v. Downey*, 343 F. Supp. 3d 459, 494 at n. 40.

---

[2]  "Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.  *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 393, 123 A.2d 663, 666; *Linnet v. Hitchcock*, 324 Pa. Super. 209, 214, 471 A.2d 537, 540.  Additionally, of course, there must be consideration on both sides.  *Stelmack v. Glen Alden Coal Co.*, 339 Pa. 410, 14 A.2d 127 (1940); *Cardamone v. University of Pittsburgh*, 253 Pa. Super. 65, 384 A.2d 1228 (1978).  Consideration 'confers a benefit upon the promisor or causes a detriment to the promise and must be an act, forbearance or return promise bargained for and given in exchange for the original promise.'  *Curry v. Estate of Thompson*, 332 Pa. Super. 364, 371, 481 A.2d 658, 661 (1984)."

A contract is sufficiently definite where it is not "impossible to understand and enforce." 584 F.3d at 585, *citing Mazzella v. Koken*, 559 Pa. 216, 739 A.2d 531, 537 (1999). In other words, the terms of the bargain must be set forth with sufficient definiteness to be specifically enforced. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002).

Finally, a contract is not enforceable without consideration. *Blair*, *supra*. Consideration has been defined by the Pennsylvania courts as a benefit to the party promising, or a loss or detriment to the party to whom the party is made; the detriment incurred must be the *quid pro quo*, or the "price" of the promise, and the inducement for which it was made. *Glover v. Junior*, 333 A.3d 323, 339-40 (Pa. 2025).

### 2.   *Breach of Duty Imposed by Contract*

The breach of a contract is material if it will deprive the injured party of the benefit that is justifiably expected under the contract. *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 315 (3d Cir. 2001).

### 3.   *Damages*

The Court of Appeals for the Third Circuit has explained: "In general, contract law espouses three distinct, yet equally important, theories of damages to remedy a breach of contract: 'expectation' damages, 'reliance' damages, and 'restitution' damages." *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 669 (f3d Cir. 1998).

Expectation damages are designed to place the aggrieved party in as good a position as would have occurred had the contract been performed. *Id*. They are measured by the losses caused and gains prevented by the defendant's breach, minus any savings made possible by the nonperformance. *Id*. Where lost profits cannot be measured with certainty, a court may award reliance damages, which seek to place the injured party in the position it would have obtained

had the contract never been made, usually through the recovery of expenditures actually made in performance of the contract.  *Id*.  Restitution damages require the party in breach to disgorge the benefit received by returning it to the party who conferred it, and are appropriately awarded where traditional principles of equity, such as unjust enrichment, render it appropriate.  *Id*.

IV.    *Discussion*

    A.    *The Parties Formed Contracts*

The undisputed facts in this case, as outlined above, are sufficient to show that the parties entered three separate contracts for Curtis Barlow to have Goeated's Volt Inu token listed on specified cryptocurrency exchanges in exchange for money paid to him by Goeated.  As to each, an offer and acceptance are patent, and the parties agreed upon sufficient material and necessary details to create the required definiteness.  Finally, consideration is present as to each contract, with Barlow agreeing to take certain actions in exchange for money which he accepted from Goeated.

First, between April 25 and 27, 2022, Barlow agreed to have the Volt Inu token listed on VinDax, Bithumb, Poloniex, and FTX, for a total of $450,000.00.  Plaintiff's Exhibit B at 77-81. As noted above, the price for each listing was specified, and the parties agreed on terms such as that it was a "pay and go" arrangement, with payment in advance to a specified Ether wallet.  *Id*. Significantly, the parties agreed that Goeated would receive a refund if the listings "didn't happen."  *Id*. At 80-81.

On May 3, 2022, the parties agreed to enter a second contract, superseding the first contract:  Goeated would pay Barlow $1,000,000 for listing the token on FTX, Poloniex, VinDax, Bithumb, Crypto.com and Kucoin.  *Id*. At 94-95.  Payment for the amount over the

previously tendered $450,000.00 was delivered by Goeated and accepted by Barlow on May 6, 2022.  *Id*. at 102-103.

Thirdly, on June 2, 2022, Goeated and Barlow contracted for a listing on Binance arranged by Barlow in exchange for a payment by Goeated of $300,000.  *Id*. at 158-159. Payment would be made in a specified cybercurrency, and mailed to a specified wallet.  *Id*. This time, timing was discussed in detail:  when "onboarding" was complete for FTX, the listing date would be set in 2-3 weeks maximum; then other listings would be spaced out at 3-week intervals. *Id*. at 162.

The agreements between Goeated and Barlow, therefore, included all elements necessary to form binding contracts.  *Channel Home Centers*, *supra*, at 795 F.2d 298.  Barlow argues that the agreements lack crucial terms which are "normal" in "an agreement involving funds of this magnitude," specifically "who bore the risk of loss if the market crashed, notice of breach, choice of forum, indemnification, [and] construction against maker."  *Defendants' Proposed Statement of Undisputed Facts* at ¶ 13.  The absence of these terms, however, does not render these contracts impossible to understand and enforce.  *Eagle Outfitters* at 584 F.3d 585.

B.    *Barlow Breached his Contracts with Goeated*

Clearly, Barlow breached his duties under the contracts he entered with Goeated.  He did not have the Volt Inu token listed on any of the six exchanges which were the subject of the contracts, except for VinDax.  Nor did he return Goeated's money as he had agreed to do if the listings did not come to fruition.  Goeated was clearly deprived of the benefit it justifiably expected under the contracts.  *General Motors Corp. v. New A.C. Chevrolet, Inc.*, *supra*, at 263 F.3d at 315.  Therefore, this was a material breach.

Barlow's theories for why performance was impossible are not convincing.  First, Barlow argues that Goeated's "admitted retention of multiple individuals to list the tokens acted as an intervening cause which impaired Barlow's ability to perform," citing the affidavit of Joelson Mercedo Mahinay as evidence.  *Response* at unpaginated 11/13.  He relies solely on Mahinay's own statement in his affidavit.  However, Mahinay actually wrote:  "*After Barlow failed to perform*, and, at that point, had ignored my attempts to contact him for five months, I engaged other parties to secure the Token's listing."  Plaintiff's Exhibit A at ¶ 15 (emphasis supplied).  Barlow has not even alleged, much less has he proved, that he did any work on Goeated's behalf after sending his last message to Goeated on July 7, 2022.  Nor has he alleged that he even knew that Goeated contracted with other individuals until he found out about it in litigation.  Thus, he has not proved that Goeated's actions prevented his performance.

Barlow also argues that his performance was rendered impossible by the FTX bankruptcy "which led to a collapse in the cryptocurrency market."  *Response* at unpaginated 11/13.  Yet, Barlow last contacted Goeated in early July, having achieved no listings since May, when the token was listed on VinDax.  FTX filed for bankruptcy on November 11, 2022, in the wake of market chaos caused by an article published in the first few days of November, 2022.  *In re FTX Trading Ltd.*, *supra*, at *2.  FTX's bankruptcy, therefore, significantly post-dated Barlow's disappearance and failure to perform under his contracts with Goeated, and could not have been the cause of his breach.

In any event, impossibility of performance cannot explain why Barlow would have retained the money paid to him by Goeated.  In *Dixon v. Lincoln University*, plaintiffs sued their university for taking full payment for tuition, meals, and dormitory residences, but only providing online education during the COVID shutdown.  The Honorable Karen Marston denied

the defendant's motion to dismiss a claim for breach of implied contract on the basis of

impossibility, writing:

> [W]hile the pandemic and related government orders may have permitted defendant to
> stop providing the promised in-person education, it does not permit them [*sic*] to retain
> all tuition and fees paid for that experience.  Thus, Plaintiff is permitted to proceed on the
> breach of implied contract claim and seek restitution in the form of the prorated tuition
> and fees, notwithstanding Defendant's impossibility or impracticability defense.

Civ. A. No. 24-1057, 2024 WL 4156837 at *6 (E.D. Pa. Sep. 10, 2024).  Even where

performance is truly impossible, therefore, the tendered payment must be returned.

      C.    *Damages*

Goeated seeks restitution damages in this case.  It writes:  "Goeated's damages can be

calculated as follows:  (i) the price for the VinDax exchange listing at $25,000, which Barlow

performed; subtracted from (ii) the total price paid to Barlow under the Listing Agreements at

$1,300,000.  Accordingly, Barlow is liable for $1,275,000."  *Memorandum of Law in Support of*

*Plaintiff's Motion for Summary Judgment* at 9.

Although restitution damages are usually awarded as equitable relief, they are sometimes

found to be appropriate in a claim for breach of contract.  In *ATACS Corp. v. Trans World*

*Communications, Inc.*, *supra*, the Court of Appeals for the Third Circuit wrote:

> Notwithstanding any uncertainty in assessing lost profits as a measure of expectation
> damages, contract law does not preclude an otherwise appropriate remedy under a
> restitution theory of damages.  This is especially the case where, as here, unknown
> variables cloud a reasonably certain calculation of lost profits stemming from the breach
> of the … agreement.

155 F.3d at 671.  *See also TriState HVAC Equip. LLC v. Big Belly Solar, Inc.*, 836 F. Supp. 274,

289 (E.D. Pa. 2011) ("[E]ven where an enforceable contract exists, under certain circumstances

courts will allow restitution as an alternative remedy for a breach of the contract").

Here, as in *ATACS*, unknown variables cloud a reasonably certain calculation of the position in which Goeated would have found itself if the contracts with Barlow had been performed, given the variable state of the cybercurrency markets and the wide range of actions Goeated might or might not have taken after the token was listed. The situation is further complicated by the fact that Goeated was eventually able to list the Volt Inu token on exchanges other than VinDax. At the same time, Goeated has never recovered any of the money it paid to Barlow. In these circumstances, restitution damages are appropriate.

Goeated measures its damages as $1,275,000.00, representing the $1.3 million it contracted to pay Barlow as consideration, minus $25,000.00, the agreed-upon price for Barlow to list the Volt Inu token on the VinDax exchange, which he accomplished. *Plaintiff's Memorandum of Law* at 9. This is a reasonable measure of Goeated's damages.

Barlow has not contested Goeated's method of calculating its damages. He argues, however, that "the issue of damages is one for the factfinder to determine, even if liability for breach of contract is found." Defendant's Exhibit 5 at ¶ 17. He writes that "the remaining value" of the cybercurrency he possessed at some unspecified time was reduced to $250,000.00, because he made a $300,000 payment to Poyser, and because of a sharp loss in value of the cybercurrency due to the November, 2022, FTX bankruptcy. *Id*.

The issue in assessing restitution damages, however, is how much Goeated gave to Barlow, not what became of the payment once it was in Barlow's hands. Under the restitution theory of damages, Goeated would not have been entitled to a bonanza if the cybercurrency gained in value after it was paid to Barlow, but similarly, its damages are not reduced by the fact that the currency lost value later. The fact that the FTX bankruptcy took place five months after Goeated's third payment to Barlow, and long after Barlow's breach became apparent, further

highlights its irrelevancy. As for Barlow's payment to Poyser, it took place without Goeated's

agreement or involvement, since it was not part of the contracts between them. Therefore,

Barlow has not succeeded in showing an issue of fact precluding summary judgment as to

damages on the breach of contract count.

V.      *Conclusion*

        For the reasons set forth above, I will grant Goeated's motion, and enter partial summary

judgment against Curtis Barlow on Goeated's breach of contract claim in the amount of

$1,275,000.000.

        Remaining in the case are (1) a breach of contract action against 484 Entertainment; (2) a

claim for anticipatory breach of contract against Barlow; (3) a claim for anticipatory breach of

contract against 484 Entertainment; (4) a claim for fraud against Barlow; (5) a claim for fraud

against 484 Entertainment; and (5) a claim of vicarious liability against 484 Entertainment.

BY THE COURT:

*/s/ Scott W. Reid*

_____

SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE